IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

---

SHELLEY DAVID,

                      Plaintiff,                OPINION AND ORDER

  v.

                                                  14-cv-653-bbc

CAROLYN COLVIN,
Acting Commissioner of Social Security,

                      Defendant.

---

      This is an application for judicial review of a final decision of the Commissioner of Social Security brought pursuant to 42 U.S.C. § 405(g). Plaintiff Shelley David, who suffers from depression, anxiety, panic disorder and a personality disorder, challenges a June 5, 2013 decision by the commissioner that she is not disabled and therefore not entitled to Disability Insurance Benefits under §§ 216(i) and 223 of the Social Security Act. Specifically, plaintiff argues that the administrative law judge who decided her case at the hearings level failed to build an accurate and logical bridge from the evidence to his conclusion that she could performed sustained work activities on a regular and continuing basis.

      After reviewing the record, the administrative law judge's decision and the parties' briefs, I conclude that plaintiff has shown that remand of the case is necessary. The administrative law judge discussed only isolated portions of the record evidence, leaving this court unable to discern whether he gave full consideration to the evidence suggesting that plaintiff is unable to maintain full time employment because of her mental impairments. In particular, in rejecting the credibility of her allegation that she cannot work full time, the

administrative law judge appears to have misapprehended the evidence about plaintiff's vocational rehabilitation efforts, medical conditions and work history or considered it only in part. Because the administrative law judge's opinion reflects a flawed evaluation of the evidence, I am reversing the decision and remanding the case to for further proceedings consistent with this opinion.

The following facts are drawn from the Administrative Record.

## FACTS

### A. Procedural History

Plaintiff filed an application for disability insurance benefits on January 5, 2011, at the age of 51, seeking benefits for the time period starting December 9, 2010. (Plaintiff had filed a previous application in 2008, which was denied after a hearing on December 9, 2010. It is not clear from the record whether plaintiff appealed this decision.) After the local disability agency denied plaintiff's application initially and on reconsideration, plaintiff exercised her right to request a hearing before an administrative law judge. A hearing was held on May 13, 2013 at which plaintiff testified via videoconference; a vocational expert also testified. Plaintiff was represented by counsel at the hearing.

On June 5, 2013, the administrative law judge issued a decision finding plaintiff not disabled at any time between her alleged onset date and the date of his decision. The Appeals Council denied plaintiff's request for review, making the decision of the

administrative law judge the final decision of the commissioner for purposes of judicial review.

B. Background and Medical Evidence

Plaintiff has a history of mental impairments and associated treatment since 1994. She has a diagnosis of several mental impairments, including depression, anxiety, panic disorder and a personality disorder, for which she receives regular psychiatric treatment. She has had multiple bouts of severe depression, some of which have led to inpatient hospitalization. She also experiences anxiety, paranoia and panic attacks, particularly when she is around large groups of people. Plaintiff has been on numerous psychotropic medications, including fluoxetine, venlafaxine, paroxetine, alprazolam, clonazepam, ziprasidone, quetiapine, trazodone, risperidone, aripiprazole, imipramine and doxepin. AR 506, 646.

Plaintiff's work history consists mostly of various part-time jobs of short duration. She has worked as an assembly worker, clothes sorter, newspaper labeler, dock associate, bakery helper, sales clerk, line worker and newspaper carrier. At the time she applied for benefits, she was working one or two days a week, delivering newspapers. Her earnings record shows that she has been employed almost every year dating back to 1977, but that her earnings have been minimal. AR 182-83.

The record before the administrative law judge contained plaintiff's treatment records dating from early 2010 through mid-2013. These records present a history of waxing and waning symptoms, with plaintiff sometimes doing better, sometimes worse, depending on the medication she is taking and outside causes of stress in her life. Plaintiff often self-adjusts her medication dosages or seeks medication changes because she believes they are of no benefit or have side effects such as weight gain, nausea, hair loss, acne or bad dreams. AR 436, 451, 459, 465. Plaintiff's treating psychiatrist at the time in question was Dr. Alpa Shah; plaintiff also received psychotherapy on an intermittent basis from Anthony Waisbrot and Susan Shane. Dr. Shah noted on multiple occasions that plaintiff was difficult to treat because of her personality disorder and fear of medication side effects. AR 871, 896, 929, 930, 939.

On September 16, 2011, Joan Kundis, Ph.D, a consulting expert for the local disability agency, reviewed plaintiff's medical records and provided an opinion regarding plaintiff's mental impairments for the period December 9, 2010 to September 16, 2011. AR 485-502. Kundis concluded that in spite of her mental impairments, plaintiff was capable of "the basic mental demands of unskilled work on a sustained basis that does not have her working closely with the general public." AR 502.

On January 1, 2012, plaintiff admitted herself to the Norwood Health Center after being screened at the emergency room with complaints of a panic attack or nervous breakdown. Plaintiff reported that her anxiety was out of control; she was afraid to dim the

lights in her hallways at home and preoccupied with a recent diagnosis of endometrial hyperplasia after her mother-in-law had recently died of ovarian cancer. Dr. Shah evaluated plaintiff on admission, assigning her a Global Assessment of Functioning score of 30. (On the Global Assessment of Functioning Scale, a score of 21-30 indicates serious impairment in communication or judgment or inability to function in almost all areas. Diagnostic and Statistical Manual of Mental Disorders, 4th ed., at 24.) Summarizing plaintiff's history, Dr. Shah noted that plaintiff's outpatient medication adjustments had been ineffective, noting that plaintiff was "sensitive to side effects and overly focused on medications, [has] poor insight and ability to engage in cognitive behavioral techniques. She tends to catastrophize and is difficult to redirect. Personality factors contribute schizoid features." AR 510-14. Plaintiff remained in the hospital for five days and her medications were adjusted. At discharge, her Global Assessment of Functioning score was 50, indicating serious symptoms.

Plaintiff's symptoms of low motivation, depression and anxiety continued after her discharge. At Dr. Shah's suggestion, in February and March 2012 plaintiff underwent a series of electroconvulsive treatments for her severe depression. Although plaintiff's providers noticed objective improvement, plaintiff continued to report symptoms of depression, hopelessness and anxiety. Dr. Shah continued to try different medication combinations, with plaintiff continuing her pattern of questioning their efficacy and complaining of side effects.

5

In connection with plaintiff's request for reconsideration, Jack Spear, a consultant for the local disability agency, reviewed plaintiff's records in March 2012 and affirmed Kundis's earlier determination that plaintiff could perform some limited types of unskilled work. Spear found that plaintiff's statements regarding her symptoms were credible but that her condition from her alleged onset date to her date last insured was not so severe as to be disabling. AR 658.

On March 14, 2013, Joel Rooney, Psy. D., administered the Wechsler Abbreviated Scale of Intelligence (WASI) to assess plaintiff's intellectual functioning. Results indicated that plaintiff was functioning in the low average to borderline range with a full scale IQ of 84 and that she had a non-verbal learning disability, specifically, an impairment in her ability to perform visual spatial integration problem solving. AR 980-82.

C. Vocational Rehabilitation

Plaintiff began receiving services from the Department of Vocational Rehabilitation in August 2011. In a note dated August 11, her counselor, Kurt Kann, wrote that he was familiar with plaintiff from working with her in the past. Kann noted that plaintiff's disabilities would interfere with her ability to get a better job (plaintiff had only her paper route at the time) and that she would require continued mental health managements, assessment of her work abilities and job development services along with possible job

coaching. In early 2012, Kann referred her to the Opportunity Development Center (ODC), a job development agency, where she was followed by vocational specialist Lynn Haefer.

From March 26, 2012 through April 11, 2012, ODC conducted an on-the-job-assessment of plaintiff's work abilities. Plaintiff was assigned to work from 9:30 a.m. to 1:30 p.m. in the mail department for an insurance company. Her work was monitored by a job coach, who provided help when needed. Assessing plaintiff's job skills at the end of the trial work period, Haefer wrote that plaintiff had a number of strong suits: she was neatly groomed, pleasant, punctual, eager to work and cooperative with her supervisor. On the down side, however, were a number of problems related to plaintiff's anxiety: she arrived unacceptably early on several days, even after being instructed not to do so; worried that her coworkers were staring at her; often needed things explained to her more than once; seemed to lack confidence; accused her counselor of not wanting to work with her after not hearing from her in two days; and worried a great deal about the next step in her program. Haefer recommended as a next step that plaintiff obtain temporary work for a period of four to eight weeks in order to address these potential barriers to employment. AR 256-261.

Plaintiff began a temporary work program as a crew worker with Goodwill Industries on June 5, 2012. Things did not go well. Plaintiff was scheduled to work Monday, Tuesday and Thursday from 9:30 a.m. to 3 p.m., but her hours were soon reduced to four a day because she lacked energy to complete the five-hour shift. Plaintiff was provided a job coach, whose support was expected to diminish as plaintiff got accustomed to the job. Over time,

however, the amount of coaching that plaintiff needed increased, not decreased. According to the job coaching report, in July plaintiff needed significant support to manage her "extreme anxiety and paranoia," including reassurance that staff were not staring at her, being snobby towards her or giving her dirty looks. AR 272. In addition, she also needed "quality checks, retraining and redirection to correct her multiple mistakes." Id. Haefer reported that, by the end of July, plaintiff was "upset, tearful, extremely anxious and paranoid," and that an agreement had been made to reduce plaintiff's schedule to two days a week instead of three. AR 278. Plaintiff completed the program on August 16, with little improvement; Goodwill stated it would not consider plaintiff for hire.

Summarizing plaintiff's ability to work, Haefer wrote that plaintiff had "a strong desire to work and is motivated to bring in an income to her household," but that her ongoing struggle with anxiety and paranoia affected her ability to work. AR 285. Plaintiff was unable to build good working relationships with people, maintain attendance, retain information from day to day and was anxious and under stress throughout the entire temporary work program. Haefer was of the opinion that plaintiff would not be able to maintain employment without long term job support, such as a job coach, and even then she might not succeed. AR 285. In fact, a month later, Haefer told DVR that she would not do any further job development on plaintiff's behalf because she would not be able to certify to employers that plaintiff was capable of performing the essential functions of a job without proper support. AR 678.

8

### D.  Hearing Testimony

Plaintiff testified that she is unable to hold a job for very long because of her paranoia, which makes her think her supervisors or coworkers are making fun of her behind her back.  Those feelings lead to anxiety and sometimes a panic attack.  Jobs requiring a fast pace such as assembly work also lead to panic.  In addition, plaintiff said that when she is depressed, she has a hard time getting out of bed or completing tasks.  Plaintiff lives with her husband, who works.  Her daily activities consist of doing dishes when needed, occasional sweeping or vacuuming, talking to her mother on the phone, taking care of a pet dog and pet rabbit, watching television and surfing the internet.  She shops for groceries, talks to her mother on the phone on a regular basis and attends weekly support groups for depression. AR 41-66.

After plaintiff testified, the administrative law judge called the vocational expert. After establishing that she was qualified, the administrative law judge posed a hypothetical that asked her to assume an individual of plaintiff's age, education and work history with the following residual functional capacity:

- no exertional limitations;
- could perform only simple, routine and repetitive tasks;
- could not work at fast pace;
- could make only simple work-related decisions;
- could handle few, if any, work place changes;

- could interact with co-workers only occasionally; and

- could have only brief and superficial interactions with the public.

AR 69. When asked to hypothesize whether there were any unskilled jobs available for such an individual, the vocational expert identified the jobs of potato chip sorter, agricultural sorter and cleaner in a retail store, indicating that such jobs existed in significant numbers in Wisconsin. AR 70.

### E. The Administrative Law Judge's Decision

On June 5, 2013, the administrative law judge issued a decision finding plaintiff not disabled between her alleged onset date of December 9, 2010 and the date of his decision. AR 11-18. The administrative law judge then proceeded through the five-step process for evaluating disability claims, 20 C.F.R. § 404.1520(a), finding (1) plaintiff had not engaged in substantial gainful activity after the onset date; (2) plaintiff had the severe impairments of depression, anxiety, social phobia and personality disorder; (3) plaintiff's impairments did not meet or medically equal the criteria of any "listed" impairment; and 4) plaintiff had no past relevant work. At step five, he found that plaintiff was able to perform jobs existing in significant numbers in the national economy, namely, potato chip sorter, agricultural product sorter and cleaner in a retail store.

In reaching his conclusion at step five, the administrative law judge adopted the residual functional capacity that he had formulated at the hearing. He acknowledged that

10

plaintiff's mental impairments would pose limitations on her ability to work, but found that her statements "concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely credible for the reasons explained in this decision." AR 16. Presumably, the administrative law judge was referring to certain pieces of evidence that he identified as incompatible with plaintiff's claim that she was unable to work, namely:

- a statement in the DVR records indicating that plaintiff's mental impairments would interfere with her ability to get a "better" job;

- a note in the DVR records indicating that plaintiff and her husband insisted that she would have no difficulty getting to work on a regular basis;

- plaintiff's work history, which showed rather minimal earnings throughout her lifetime; and

- plaintiff's testimony that she "maybe" collected unemployment benefits, which implied an ability to work.

The administrative law judge limited his discussion of the extensive medical record to a single paragraph, highlighting plaintiff's failure to take her medications as prescribed, her admission to her providers that a lack of structure during the day made her symptoms worse, notes from February 2013 noting plaintiff's lack of reliability with respect to her symptoms and the objective improvement noted by Dr. Shah in spite of plaintiff's continued subjective complaints. AR 15. As the administrative law judge saw it, "the evidence suggests that were she busy on a full-time basis and consistent with treatment, her mental signs and symptoms would be greatly reduced." AR 16. Therefore, he concluded, her claim that she could work only part time was not credible.

The administrative law judge stated that he had given "great weight" to the opinions of the two state agency consultants, both of whom had concluded that plaintiff retained the ability to perform some limited types of work. He gave "lesser weight" to Rooney's psychological evaluation; even so, he said, he had accommodated it by limiting plaintiff to simple routine and repetitive tasks, a low-stress environment free of fast paced production, that required only simple work-related decisions, few workplace changes and limited contact with co-workers and the public. AR 16.

OPINION

A district court may reverse an administrative law judge's determination only when it is not supported by substantial evidence, meaning "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" McKinzey v. Astrue, 641 F.3d 884, 889 (7th Cir. 2011) (citation omitted). Although the court will not reweigh the evidence or substitute its judgment for that of the administrative law judge, Shideler v. Astrue, 688 F.3d 306, 310 (7th Cir. 2012), this does not mean that the court will simply "rubber-stamp" the administrative law judge's decision without undertaking a critical review of the evidence. Clifford v. Apfel, 227 F.3d 863, 869 (7th Cir. 2000). An administrative law judge must evaluate both the evidence favoring the claimant as well as the evidence favoring the claim's rejection and may not ignore an entire line of evidence that is contrary to his or her findings. Zurawski v. Halter, 245 F.3d 881, 887 (7th Cir. 2001).

Consequently, an administrative law judge's decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. Lopez ex. rel Lopez v. Barnhart, 336 F.3d 535, 539 (7th Cir. 2003). Ultimately, although the administrative law judge need not provide a complete and written evaluation of every piece of testimony and evidence, he or she "must build a logical bridge from the evidence to his conclusion." Schmidt v. Barnhart, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).

Plaintiff contends that in this case, the administrative law judge failed to build an adequate bridge from the evidence to his conclusion that plaintiff is capable of maintaining full time employment. In particular, says plaintiff, the administrative law judge made a flawed credibility determination by discussing only select portions of the evidence that supported his conclusion without acknowledging contrary evidence supporting plaintiff's claim. I agree.

Particularly troubling is the administrative law judge's handling of the DVR records. These records consist of 92 pages spanning the two-year period from March 2011 to March 2013. As described in detail above, they indicate that plaintiff's paranoia, anxiety and lack of stamina interfered significantly with her ability to work at even a simple, part-time job. Moreover, they contain the opinion of plaintiff's vocational specialist that plaintiff would be unable to maintain competitive employment on her own.

Although the administrative law judge noted the DVR records, he did not discuss plaintiff's failed work attempts or Haefer's opinion. His only mention of the DVR evidence

consists of two isolated notes that he cited to support his position that plaintiff's claim of disability was not credible: 1) a comment by Kann on August 11, 2011 noting that plaintiff's impairments would "interfere with her ability to get a better job," AR 701; and 2) a March 25, 2013 note indicating that plaintiff and Kann disagreed with Haefer's opinion that plaintiff would not be able to attend work on a regular basis. AR 973. (The administrative law judge mistakenly referred to Kann as plaintiff's husband. AR 16.) These two pieces of evidence, however, do not reasonably support an inference that plaintiff is capable of full-time work. SSR 96–8p ("Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.... A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."). With respect to the former, plaintiff's desire in August 2011 to obtain a "better" job proves only that she wanted something better than the twice-a-week newspaper delivery route she had at the time. It hardly counters the other evidence in her DVR file suggesting that she is incapable of working full time. Similarly, with respect to the March 2013 note, the administrative law judge did not fully appreciate the context in which it was made: plaintiff was seeking supported employment services beginning with a trial work period during which she would work part-time, only a few days a week. Like her desire to obtain a job "better" than her newspaper route, her insistence that she could make it to work on a regular basis under these circumstances is not evidence that she is capable of working eight hours a day, five days a week. Further, even if these statements could

reasonably support a conclusion that plaintiff was not disabled, the administrative law judge did not explain his reasons for favoring these seemingly overly-optimistic statements from plaintiff about what she thought she could do over the other statements in her file that indicated that plaintiff could not work without long term vocational support. Skarbek v. Barnhart, 390 F.3d 500, 503 (7th Cir. 2004) ("An ALJ must articulate, at least minimally, his analysis of the evidence so that this court can follow his reasoning.").

The administrative law judge's analysis of the medical record suffers from a similar lack of analysis. The administrative law judge correctly observed that plaintiff had a history of stopping and starting medications, often denied any improvement in spite of her doctors' observations to the contrary and made inconsistent complaints about the side effects or symptoms she was experiencing on various medications. He also noted, correctly, that plaintiff admitted to her therapist that her lack of structure during the day made her symptoms worse and that she felt better when her focus was directed on an activity such as watching a movie.

Where the administrative law judge went astray is in concluding that "were [plaintiff] busy on a full-time basis and consistent with treatment, her mental signs and symptoms would be greatly reduced." AR 16. This was a medical finding that the administrative law judge was not qualified to make. Rohan v. Chater, 98 F.3d 966, 970-71 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings"). Further, it ignores the substantial evidence suggesting that plaintiff's

failure to adhere to a medication regime or a robust daily routine was part and parcel of her mental condition as opposed to a mere lack of fortitude. It is well documented that plaintiff's treatment—and her perception of the efficacy of that treatment—is impeded by her anxiety and excessive worry, personality disorder and sensitivity to side effects. AR 442, 445, 510, 512, 621, 640, 871, 882, 885, 896, 929, 930, 939, 944, 1030. As plaintiff points out, her failure to take her medications as prescribed, her paranoia about various side effects and her persistent subjective complaints are just as likely symptoms of her mental disorders themselves, as they are evidence of exaggeration. Martinez v. Astrue, 630 F.3d 693, 697 (7th Cir. 2011) ("[P]eople with serious psychiatric problems are often incapable of taking their prescribed medications consistently."); Kangail v. Barnhart, 454 F.3d 627, 630 (7th Cir. 2006) (mental illness "may prevent the sufferer from taking her prescribed medicines or otherwise submitting to treatment"). The administrative law judge should have explored this possibility, perhaps by consulting with a medical expert, before concluding that plaintiff could work full time if she took her medicine as prescribed.

The administrative law judge also thought plaintiff's claim of disability was not totally credible because plaintiff testified that she had "maybe" collected unemployment benefits, which he found implied an ability to work. AR 16. Although an administrative law judge may consider the pursuit of unemployment benefits in assessing a plaintiff's credibility, the court of appeals has warned that "attributing a lack of credibility to such action is a step that must be taken with significant care and circumspection. All of the surrounding facts must

16

be carefully considered." Scrogham v. Colvin, 765 F.3d 685, 699 (7th Cir. 2014). Here, the record indicates that plaintiff has a desire to work, has sought employment consistently and has taken on various jobs, only to quit after a short time period for reasons that seem to be related to her mental impairments. Under these circumstances, which the administrative law judge apparently failed to consider, her stated ability to work for unemployment compensation purposes is not necessarily incompatible with her claim for disability benefits.

The same can be said for plaintiff's minimal earnings history throughout her lifetime, which the administrative law judge thought "raise[d] a question as to whether her continuing unemployment is actually due to a medical impairment as opposed to other reasons." AR 16. The administrative law judge appeared to think plaintiff was not motivated to work. Again, however, this conclusion is undermined by various other pieces of evidence in the record, such as her consistency in seeking employment, participation in vocational counseling and the notes from her vocational counselor, all of which suggest that plaintiff could not maintain a job for any length of time because of her mental condition.

The commissioner takes the position that the administrative law judge's citation to all of the various exhibits in the record indicates that he considered all of the important evidence; to reverse, the commissioner argues, is to substitute impermissibly the court's judgment for that of the administrative law judge. Although it is true that an administrative law judge need not discuss every piece of evidence in his decision and need only have substantial evidence in the record to support his conclusion, he nonetheless must "explain

his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 351 (7th Cir. 2005) (citing Herron v. Shalala, 19 F.3d 329, 333–34 (7th Cir. 1994)). The administrative law judge failed to do that here. Instead, he appears to have selected only those facts from the record that supported his conclusion, while disregarding the facts that undermined it. As the court of appeals has made clear, this "is an error in analysis that requires reversal." Scrogham, 765 F.3d at 698.

A few additional remarks are warranted to provide guidance on remand. First, plaintiff argues that the administrative law judge erred by failing to account in his RFC assessment for Rooney's finding in March 2013 that plaintiff had an impairment in visual spatial integration problem solving. Plt.'s Br., dkt. #10, at 12. Plaintiff does not explain how such an impairment would affect her ability to work, so I am not persuaded that the administrative law judge erred in this regard. On remand, however, the agency may wish to seek an updated mental residual functional capacity assessment that accounts for Rooney's findings.

Second, a question remains as to plaintiff's date last insured. Although the administrative law judge thought it was September 30, 2014, plaintiff seems to agree with other records in the file indicating that it was September 30, 2011. AR 195; Plt.'s Br. in Supp., dkt. #10, at 2. The commissioner does not address the date last insured in her brief, so I have not focused on it. However, if it is the earlier of the two dates, then much of the

evidence discussed in this opinion, such as plaintiff's unsuccessful on-the-job assessment in the summer of 2012, may be irrelevant. Although plaintiff suggests that her overall condition did not change between 2011 and 2012, dkt. #10, at 11-12, in the event her date last insured expired on September 30, 2011, it will be up to the administrative law judge to decide in the first instance the relevance of any post-expiration evidence.

ORDER

IT IS ORDERED that the decision of the Commissioner of Social Security denying plaintiff Shelley David's application for Disability Insurance Benefits is REVERSED and REMANDED under sentence four of § 405(g) for further proceedings consistent with this opinion.

Entered this 3d day of November, 2015.

BY THE COURT:

/s/
BARBARA B. CRABB
District Judge